UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | NO. 2:05-CR-189 PS |
| | ) | |
| | ) | |
| RAMON PEREZ, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Defendant Ramon Perez's Moves to Suppress evidence that was seized during a search of his automobile. [DE 21]. The search was proper because Perez voluntarily consented to the search of his vehicle after a lawful traffic stop supported by probable cause. Accordingly, his motion to suppress is **DENIED.**

**BACKGROUND**

Defendant Ramon Perez is currently charged with one count of possession with the intent to distribute cocaine. Perez moved to suppress evidence seized during a search of his vehicle on November 7, 2005. The Court held a suppression hearing on June 30, 2006 and July 17, 2006. Ofc. Villarreal of the Lake County Police Department, Perez, and J. Roberto Mendoza, the defendant's linguistics expert, testified at the suppression hearing. The Court also reviewed audio and video recordings of the encounter that were captured by a video camera mounted to

the squad car window and an interior microphone.[1]   The parties essentially agree on the facts of the encounter except where specifically noted below.

On November 7, 2005, Officer Villarreal, of the Lake County Police Department was assigned to patrol Interstate 65 ("I-65") for traffic violations.  At approximately 1:10 p.m., Ofc. Villarreal was driving northbound in his marked Crown Victoria police cruiser at mile marker 239 when he observed a tan Toyota 4-Runner SUV traveling southbound at a high rate of speed.  Ofc. Villarreal used his radar gun and clocked the SUV as traveling at 79 miles per hour in a 70 mile per hour zone.  Ofc. Villarreal then made a U-turn to catch up to the SUV and paced the SUV traveling 79 mph for approximately a quarter of a mile.  Thereafter, Ofc. Villarreal activated his lights and pulled the car over.

As Ofc. Villarreal approached the car, he observed Perez in the car and two young girls who were approximately 2-3 years in age and 6-7 years in age, respectively.  Perez identified the girls as his daughters.  Ofc. Villarreal asked Perez for his license and registration.  Although Perez handed the documentation over immediately, he appeared to Ofc. Villarreal to be "shaky" and "jittery."   Ofc. Villarreal informed Perez that he would be receiving a warning and asked him to go to the police cruiser.

In the police cruiser, Perez sat in the front passenger seat while Ofc. Villarreal began processing the warning citation.   Ofc. Villarreal asked Perez where he was going and Perez

---

[1] The audio recording is muffled at best.  A microphone mounted inside the squad car captured the conversation that Ofc. Villarreal had with the defendant inside the car.  Ofc. Villarreal testified that he also wears a battery-operated microphone on his duty vest to record encounters outside the squad car.  However, the microphone must have malfunctioned during Ofc. Villarreal's encounter with Perez because their conversation outside the squad car is almost completely obscured by traffic noise and, as a result, the audio portion of the tape is of little value to the Court.

answered that he was going to Laffayette to pay a ticket, but he could not tell Ofc. Villarreal specifically where he was going to do that. Ofc. Villarreal also asked him who the SUV belonged to. Perez appeared unable to answer Ofc. Villarreal's question. Finally, Perez pointed to the registration papers that Ofc. Villarreal was holding and stated, "that guy's." Up until this point, Ofc. Villarreal had been conversing with Perez in English. However, Ofc. Villarreal testified that he noticed that Perez appeared abnormally sweaty and nervous and also noticed that Perez spoke with a Spanish accent. As such, Ofc. Villarreal, a native Spanish speaker, switched to Spanish in an effort to alleviate some of Perez's stress. Perez agreed that it was easier for him to converse in Spanish, but testified that he remained nervous because his young daughters were sitting in the SUV by themselves.

Continuing their conversation, Ofc. Villarreal asked Perez if he traveled to Laffayette frequently. Perez stated that he would go there occasionally to visit friends, but could not state where in Laffayette he went. Perez then showed Ofc. Villarreal the "ticket" which turned out not to be a ticket at all, but rather a summons with directions to the Courthouse. When asked why he did not simply mail the ticket in, Perez stated that he needed to pay it right away and he believed it would be faster to do so in person.

Ofc. Villarreal completed the warning paperwork and asked Perez to meet him in front of the police car. Once there, Ofc. Villarreal handed the defendant his paperwork, told him that he was free to go, and told him to be careful pulling back into traffic. However, as Perez was returning to his car, Ofc. Villarreal called out to him saying "Hey, Sir," and once again walked towards Perez. Ofc. Villarreal asked if Perez had anything illegal in the car. Perez responded

3

that he only had the tickets.  Ofc. Villarreal then asked specifically if he had any guns or drugs in the car.  Perez responded that he did not.

At this point in the encounter, the parties' versions of the conversation differ.  Ofc. Villarreal testified that he asked Perez if he could "search it" referring to Perez's SUV.  Perez responded, "if you like," and gestured towards the SUV.  Thereafter, Ofc. Villarreal had Perez move his daughters from the SUV to the squad car and proceeded to search the SUV with other officers who had just arrived on the scene.  In contrast, Perez testified that Ofc. Villarreal asked him if he could "look in" the SUV.  Perez understood this to mean "look," not "search."  Perez testified that he did not verbally respond to Ofc. Villarreal, but merely shrugged.  Finally, J. Roberto Mendoza, the defendant's linguistic expert, seems to corroborate portions of both witnesses' testimony.  First, Mendoza testified that Ofc. Villarreal asked Perez whether he could "check" the SUV.  Mendoza specifically stated that Ofc. Villarreal did not command Perez to allow him to search the car, but rather asked whether he could "check" the SUV.  However, Mendoza also testified that Perez did not verbally respond to Ofc. Villarreal's question.

As noted above, the videotape of the encounter did not contain a clear audio recording and, therefore, did not help the Court determine what conversation actually took place outside the squad car.  However, the videotape did show what appeared to be a relatively casual encounter between Ofc. Villarreal and Perez.  At no point during the relatively brief conversation did Ofc. Villarreal appear to menace or threaten Perez nor did Perez appear to be frightened or overcome by the officer.  The videotape also reveals that Perez shrugged his shoulders and gestured towards the car when he was asked by Officer Villarreal if he could search it.

4

**DISCUSSION**

Perez seeks to suppress the evidence seized from his vehicle on November 7, 2005. He argues that the search of the SUV was nonconsensual for two reasons.  First, he argues that Ofc. Villarreal lacked reasonable suspicion to continue to detain him after Perez received his warning papers and was told he was free to leave.  Second, he argues that he never voluntarily consented to the search of vehicle.

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. CONST., amend. IV.  Automobile or traffic stops constitute the seizure of a person; therefore, they must be reasonable to pass constitutional muster.  *See Whren v. United States*, 517 U.S. 806, 189 (1996).  Generally speaking, a traffic stop is reasonable if the police have probable cause to believe a traffic violation occurred.  *Id*.

There is no dispute in this case that Ofc. Villarreal had probable cause to originally pull Perez over for speeding.  However, Perez argues that after Ofc. Villarreal gave Perez his warning ticket and told him that he was free to leave, Ofc. Villarreal could not "re-detain" Perez to ask him about drugs and guns without reasonable suspicion to do so pursuant to *Terry v. Ohio*, 392 U.S.1 (1968).

Recent Seventh Circuit decisions have moved away from a *Terry*-style analysis in determining the propriety of the scope of questioning in traffic stops.  For example, it is permissible for an officer to ask questions unrelated to the initial purpose of a traffic stop regardless of whether the officer has reasonable suspicion to support his unrelated questions. *United States v. Muriel*, 418 F.3d 720, 725 (7th Cir. 2005) (officers conducting a traffic stop based on probable cause "need not have reasonable suspicion to ask questions unrelated to the

5

purpose of the traffic stop"); *United States v. Childs*, 277 F.3d 947, 949-54 (7th Cir. 2002) (holding that it is reasonable for an officer to extend an traffic stop to ask the driver questions about drugs and whether he would consent to a search of the vehicle). That being said, an officer with probable cause to make a traffic stop does not have *carte blanche* to do whatever he pleases. As the Supreme Court recently noted, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The Seventh Circuit has emphasized that the length of detention following a traffic stop based on probable cause must be reasonable. *See Muriel*, 418 F.3d at 725; *Carpenter*, 406 F.3d at 916; *Childs*, 277 F.3d at 954 ("What the Constitution requires is that the entire process remain reasonable."). Questions that prolong the length of the stop may affect the reasonableness of the detention. *Muriel*, 418 F.3d at 725.

    Here, Ofc. Villarreal's conduct during the stop, including the questions that he posed to Perez after he handed Perez his warning and told him that he was free to leave, did not render the stop unreasonable. *See United States v. Bennett*, 2005 WL 3560685 at *2 (N.D. Ill. Dec. 27, 2005) (holding that traffic stop was reasonable even though officer continued to ask questions after he informed the defendant that she was free to go). Just moments after Ofc. Villarreal gave Perez his warning, Ofc. Villarreal called out to Perez again. He did not command Perez to stop, but rather merely called out "Hey, sir" and asked whether Perez had anything illegal in the car. When Perez responded in the negative, Ofc. Villarreal immediately asked whether he could check or look. Thus, the entire second round of questioning lasted less than 10 seconds. There

is nothing unreasonable about 10 seconds of additional detention in the course of a nine minute traffic stop.

Moreover, even if we were to analyze the so-called "second stop" under a *Terry*-style reasonable suspicion analysis, Ofc. Villarreal's second round of questioning would certainly pass muster. "Reasonable suspicion" means "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Johnson*, 383 F.2d 538, 542 (7th Cir. 2004). Thus, information which is lawfully obtained during an initial traffic stop may cause the police officer to become reasonably suspicious of criminal conduct. This reasonable suspicion, in turn, may justify prolonging the traffic stop to permit additional reasonable investigation. *Bennett*, 2005 WL 3560685 at *4 (citing *United States v. Martin*, 422 F.2d 597, 602 (7th Cir. 2005)).

Perez's actions during the traffic stop gave Ofc. Villarreal reasonable suspicion to prolong the stop and perform further reasonable investigation. At the very beginning of the traffic stop, Perez's actions struck Ofc. Villarreal as suspicious – a feeling that grew throughout their encounter. Villarreal approached Perez's SUV, told him why he was being pulled over, and asked for his license and registration. Almost immediately, Ofc. Villarreal noticed that Perez was nervous and shaky. Ofc. Villarreal then asked Perez to come with him back to the squad car while he processed the warning ticket.

Inside the squad car, an encounter lasting only seven minutes, Ofc. Villarreal became even more suspicious of Perez. First, he noticed that Perez continued to fidget and sweat which suggested to Ofc. Villarreal that Perez was quite nervous. Second, Perez was unable to give clear, specific answers to Ofc. Villarreal's questions. For example, when Ofc. Villarreal asked

7

Perez where he was going, Perez responded that he was going to Lafayette to pay a ticket, but could not state specifically where he needed to go. Then, Perez showed Ofc. Villarreal a document that was not actually a ticket, but was a summons with directions to the courthouse. When asked why he did not just mail in the fine, Perez stated that he thought it would be "faster" to pay the ticket in person. In addition, Perez could not immediately tell him who was the owner of the SUV. Instead, Perez hemmed and hawed in response to Ofc. Villarreal's question until Perez was able to see the vehicle registration in Ofc. Villarreal's hand – at which point he answered, "that guy's." All of these factors combined led Ofc. Villarreal to the reasonable conclusion that something more was afoot than a mere speeding violation. As such, Ofc. Villarreal decided that he would ask for consent to search the vehicle.

Perez also argues that the search was invalid because he never consented to the search of his vehicle. The evidence demonstrates otherwise: Ofc. Villarreal asked Perez for consent to search the vehicle and Perez voluntarily gave his consent.

Law enforcement officers, without a warrant or in the absence of any probable cause, may conduct a search based upon an individual's voluntary consent, and any evidence discovered during the consent search may be seized and used during a subsequent prosecution. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Raibley*, 243 F.3d 1069, 1077 (7th Cir. 2001). To determine whether consent was given voluntarily, courts examine the totality of the circumstances surrounding the consent. *Raibley*, 243 F.3d at 1077. Factors in assessing voluntariness include, but are not limited to, the person's age, intelligence, education, and language ability. *Id.* at 1075-76; *United States. v. Zamoran-Coronel*, 231 F.3d 466, 469-70 (8th Cir. 2000); *United States v. Zuiba-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001). The

8

consent may be express or implied, but need not be knowing and intelligent, and may be given unintentionally and without knowledge of the right to refuse consent. *Schneckloth* 412 U.S. at 235-36; *United States v. Drayton*, 536 U.S. 194, 206-07 (2002); *United States v. Saadeh*, 61 F.3d 510, 518 (7th Cir. 1995) (consent to search voluntary even though suspect was not informed of right to refuse consent). The government has the burden of proving, by a preponderance of the evidence, that the consent was freely and voluntarily given. *Schneckloth*, 412 U.S. at 227.

Here, Perez voluntarily consented to the search of his car. All of the witnesses who testified at the suppression hearings agreed that Ofc. Villarreal asked Perez if he could check or look in the vehicle. Ofc. Villarreal credibly testified that Perez responded, "if you like" which Ofc. Villarreal could reasonably interpret within the context of the conversation to constitute consent. Although the videotape did not record an audible response from Perez, his body language likewise suggests voluntary consent. *U.S. v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004) ("An explicit verbal consent or any other form of affirmative invitation . . . is not necessary to constitute 'consent' for purposes of the Fourth Amendment . . . Consent may be manifested in a nonverbal as well as verbal manner.") (internal quotations anc citations omitted). When Ofc. Villarreal asked Perez if he could search the car, Perez shrugged and motioned towards the SUV. Perez's testimony confirms that he shrugged in response to Ofc. Villarreal's question.

Nothing about this encounter suggested that Perez's consent was involuntary. Guns were not drawn; no threats were made; voices were not raised; and the atmosphere was a calm one. There is nothing about Perez's age and intelligence that would suggest that his will was somehow overcome and the consent was involuntary. Indeed, Ofc. Villarreal switched to

Spanish during the encounter in order to assist Perez and alleviate some of his stress.  At the time of the consent, Ofc. Villarreal had previously told Perez that he was free to leave.  Perez had received his paperwork and there was nothing that Ofc. Villarreal did that would cause Perez to think that he had no choice but to consent to the search of the SUV.  Thus, the government met its burden and proved by a preponderance of the evidence that Perez's consent was voluntary.  *See United States v. Mendoza*, 438 F.3d 792, 796 (7th Cir. 2006).

In sum, the initial traffic stop was supported by probable cause.  The brief questioning that immediately followed was reasonable under the circumstances and Ofc. Villarreal lawfully obtained Perez's consent to search the car.  Once Perez voluntarily consented to the search of his car (and did not revoke the consent), the police had the right to conduct a search.  On this record, the Court cannot find any violation of Perez's rights under the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, Defendant Ramon Perez's Motion to Suppress [DE 21] is **DENIED**.

**SO ORDERED.**

ENTERED: August 24, 2006

s/ Philip P. Simon  
PHILIP P. SIMON, JUDGE  
UNITED STATES DISTRICT COURT